**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

REBECCA PERTA, individually and on )
behalf of the class members described )
below, )
                                             )          Case No. 18-cv-5767
              Plaintiff, )
                                              )          Judge Robert M. Dow, Jr.
           v. )
                                              )
NATIONAL CREDIT CARE )
CORPORATION; CREDIT-RX, INC.; )
and FIDELITY & DEPOSIT COMPANY )
OF MARYLAND, )

               Defendants.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rebecca Perta sought help in repairing her credit from Defendant National Credit Care Corporation ("NCC") and Defendant Credit-RX, Inc. ("Credit-RX"). She alleges, among other things, that those defendants misrepresented their services, charged her for services prematurely, and fraudulently sent documents to credit reporting agencies. Plaintiff filed a purported class action complaint [1], bringing four claims against NCC and Credit-RX under the Credit Repair Organization Act, 15 U.S.C. § 1679 *et seq*. ("CROA"), the Illinois Credit Services Organization Act, 815 ILCS 605 *et seq*. ("CSOA"), and the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/2 *et seq*. ("ICFA"), and one claim against a surety bond issued by Fidelity & Deposit Company of Maryland ("FDCM"). NCC and FDCM moved to dismiss [25], arguing that (1) Plaintiff lacks Article III and statutory standing because she failed to allege a concrete injury; (2) the complaint fails to meet the heightened pleading requirements of Rule 9(b); and (3) the complaint fails to state a claim under the CROA and CSOA.

For the reasons explained below, the motion to dismiss [25] is granted and the complaint [1] is dismissed for lack of subject matter jurisdiction because it fails to allege a concrete injury as required for Article III standing. The dismissal is without prejudice and with leave to file an amended complaint by October 28, 2019. This case is set for further status hearing on November 5, 2019 at 9:00 a.m.

## I. Background[1]

Defendants NCC and Credit-RX offer credit repair services to consumers. Defendant Fidelity and Deposit Company of Maryland ("FDCM") issued a $100,000 surety bond[2] to Defendant NCC, Bond No. LPM7619362, underwritten by Zurich American Insurance Company. Plaintiff Rebecca Perta sought help from NCC and Credit-RX in addressing problems with her credit reports and improving her credit. Claiming that Defendants mispresented their services, billed her prematurely, and sent false documents to credit reporting agencies, Plaintiff filed the complaint [1] now before the Court.

Venue is proper in this district pursuant to 28 U.S.C. § 1391, because Defendants' actions and conduct affected Plaintiff within this district and Defendants conduct business within this district. The Court's subject matter jurisdiction is the subject of the motion before the Court. Defendant argues, among other things, that Plaintiff lacks standing because she has failed to plead an injury-in-fact. The Court discusses its findings on this issue below.

---

[1] When ruling on a motion to dismiss for lack of subject matter jurisdiction, a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

[2] The complaint says "a $120,000 surety bond" ([1] at 3), but the copy of the bond paperwork filed with the Illinois Secretary of State and attached to the complaint says "$100,000" ([1-5] at 2).

Plaintiff, a victim of auto loan fraud,[3] wanted to dispute certain items on her credit report and improve her credit score. A friend referred her to Johanna Diaz, an employee of Credit-RX, for help improving her credit history. On December 30, 2016, Plaintiff called Diaz, who said that Credit-RX and NCC would be able to improve her credit score by sending letters to the three main Credit Reporting Agencies ("CRAs") on her behalf. Diaz said Plaintiff would need to make a down payment of $189 to sign up.

Diaz then sent Plaintiff an email [1-3] identifying NCC as Credit-RX's "processing department" and stating that NCC would send Plaintiff an email regarding payment authorization. [1-3] at 3. Diaz's email also provided instructions for Plaintiff regarding an investigation into her credit history, making future payments on debts, and updating her payment information with Credit-RX. *Id*. at 3-4. Diaz's email said that Plaintiff's credit report was attached, but the exhibit Plaintiff provided does not include any attachments.[4] *Id*. at 4.

Later on December 30, 2016, NCC sent Plaintiff an email asking her to sign the attached Client Services Agreement ("CSA"), which she signed electronically. The CSA describes two types of services: (1) Credit Report Consulting/Analysis, including "comprehensive analysis of your credit report; counseling regarding credit score algorithms; consumer credit education; consumer rights regarding credit reports and disputes; and a complete listing of the negative items appearing on your credit report"; and (2) Monthly Services, to correct errors or discrepancies on a credit report, described as "(i) reminders about materials or information that you need to provide

---

[3] See *Rebecca Perta v. Bettenhausen Motor Sales, Inc.*, Case No. 17-cv-07574 (N.D. Ill).

[4] Additionally, portions of the email appear to have been redacted, though the Court has entered no protective order in this case, and neither party has followed the appropriate procedure for filing documents under seal. See Fed. R. Civ. Pro. 5.2; L.R. 26.2. If Plaintiff files an amended complaint, the parties are reminded to comply with the federal and local rules regarding filing documents entirely or partially under seal.

to NCC (ii) access to NCC credit consultants, (iii) work to clear and-or correct your credit report of the credit and personal items which you believe to be inaccurate, misleading or unverifiable, (iv) consult directly with you as to any individual efforts needed to help correct your credit report, (v) review and analyze the correspondence from credit bureaus, creditors and others, including any credit report that is forwarded by you to NCC or received by NCC directly from such sources." [1-4] at 8. The fee for the Credit Report Consulting/Analysis was $189, "due and payable within five (5) days from the date of consultation once all services have been performed as listed above in Section 3a." *Id.* The Monthly Services cost $69 per month, billed in arrears. *Id*.

Apparently on the same day (the complaint is not entirely clear on the timing), Plaintiff received a phone call from NCC, during which she authorized NCC to charge her $189. The NCC caller described this as a "down payment," which Plaintiff paid. Plaintiff alleges that NCC and Credit-RX did not perform the services listed in 3(a) of the CSA, or perform any substantive consultation, prior to charging Plaintiff the $189 "down payment" and accepting that payment.

Plaintiff began paying the $69 monthly fee (though the complaint does not state how many times she paid it). According to Plaintiff, NCC and Credit-RX sent letters to the CRAs falsely disputing certain accounts. The complaint says NCC and Credit-RX disputed these accounts "regardless of whether Plaintiff indicated they were inaccurate," but does not state whether Plaintiff told Defendants that those accounts were or were not accurate, or whether Plaintiff said anything at all to Defendants about those accounts. [1] at 6. The complaint asserts that NCC and Credit-RX forged Plaintiff's signature on letters sent to the CRAs, attempting to deceive the CRAs into believing that Plaintiff sent the letters, because CRAs are not required to respond to or act on letters not sent "directly" from the consumer. The complaint also alleges, without describing specific statements, "On several occasions, Defendants misrepresented the efficacy of their

services, claiming that Plaintiff's credit history and report would be substantially improved—despite knowing that such an outcome was impossible given Plaintiff's credit history and background." [1] at 6.

Finally, the complaint lists a variety of things that NCC and Credit-RX did not tell Plaintiff, but which Plaintiff seems to claim are true (see [1] at 6-7), including:

- no attorney reviewed Plaintiff's credit report or advised her that it would be unlikely that her report could be changed to delete accurate adverse entries
- a generic dispute of "inaccurate" is ineffectual, that is, it does not provide enough information for a credit bureau or furnisher of credit information to investigate anything other than the accuracy of the entry as it is being reported
- a credit bureau may refuse to process repeated disputes as frivolous
- creditors are, by law, entitled to ignore disputes from credit repair organizations
- the only path toward repairing bad credit is time and diligent attention to prompt payment of credit balances
- accurate, but negative, reports to a credit bureau cannot be erased with the types of activities undertaken by Defendants

On August 23, 2018, Plaintiff filed a purported class action complaint [1], alleging that NCC and Credit RX violated the Credit Repair Organization Act ("CROA") (Count I), the Illinois Credit Services Organization Act ("CSOA") (Count II), and the Illinois Consumer Fraud Act ("ICFA") (Counts III and IV). The complaint also brings a claim against the CSOA bond, with FDCM as the defendant (Count V). On October 18, 2018, Defendants NCC and FDCM moved to dismiss [25] on four grounds. First, NCC and FDCM argue that Plaintiff fails to allege that she suffered any concrete injury, and the Court therefore lacks Article III standing over each of her claims. Second, they argue that Plaintiff's failure to plead a concrete injury also means that she fails to establish statutory standing. Third, they argue that the complaint fails to satisfy Rule 9(b)'s pleading requirements as to the CROA, CSOA, and ICFA Fraud Claims. Fourth, they argue that the complaint fails to state a claim under the CROA and the Illinois CSOA because the allegations directly contradict the written contract.

5

## II.    Legal Standard

When ruling on a motion to dismiss for lack of subject matter jurisdiction, a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff.  *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).  The Court need not "accept as true any legal assertions or recital of the elements of a cause of action supported by mere conclusory statements."  *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir.) (citation omitted).  "The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."  *Shorebank Dev. Corp.*, 182 F.3d at 554 (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993)).  On a Rule 12(b)(1) motion, as with a Rule 12(b)(6) motion, the court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in the non-movant's brief opposing dismissal, so long as those facts "are consistent with the pleadings."  *W.C. Motor Co. v. Talley*, 63 F. Supp. 3d 843, 846 (N.D. Ill. 2014) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012)).  To the extent an exhibit contradicts the complaint's allegations, the exhibit takes precedence.  See *Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007).

The burden is on the party asserting that jurisdiction exists—here, Plaintiff.  *Cty. of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 958 (N.D. Ill. 2015).; see also *Gonzalez v. Bank of Am., N.A.*, 2014 WL 26283, at *2 (N.D. Ill. Jan. 2, 2014) ("the plaintiff bears the burden of establishing the basis for the court's jurisdiction").  In order to survive a challenge to standing,

a plaintiff must plead sufficient factual allegations that "plausibly suggest" each of the elements. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015).

### III.     Analysis

#### A.     Article III Standing

The elements of standing are well settled: the plaintiff must allege an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). These requirements are rooted in Article III, which limits a federal court's authority to the resolution of "Cases" or "Controversies." U.S. Const. art. III, § 2. If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve. *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)

The first argument in the motion to dismiss involves the injury-in-fact requirement, which the Supreme Court has described as the "[f]irst and foremost" element of standing. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and quotation marks omitted). The question here is whether Plaintiff has alleged that she suffered—or faced a real risk of suffering— a concrete harm. See *Casillas*, 926 F.3d at 333. An alleged harm need not be tangible to be "concrete," but it must be "'real,' and not 'abstract.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, (2016), as revised (May 24, 2016).

It is somewhat difficult to identify specific injuries based solely on the complaint, so Plaintiff's opposition to the motion to dismiss [36] helpfully proposes four. After analyzing the complaint for plausible injuries-in-fact, the Court addresses each in turn and concludes that the

existing complaint does not plead concrete injuries sufficient to confer Article III standing on Plaintiff.

### 1.     The "unlawful down payment"

The first injury that Plaintiff's opposition brief asserts is the "unlawful down payment" of $189, which Plaintiff alleges she made to NCC before NCC provided any services.  [1] at 5, ¶¶ 30, 31.  That may suggest a violation of 15 U.S.C. § 1679b(b), which prohibits credit repair organizations from charging consumers before providing services.  But the fact that Congress has authorized a plaintiff to sue a credit repair company that acts contrary to 15 U.S.C. § 1679b does not necessarily mean that Plaintiff in this case has standing.  See *Spokeo*, 136 S. Ct. at 1549 ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.").  Congress has the power to define intangible harms as legal injuries for which a plaintiff can seek relief, see *Lujan*, 504 U.S. at 578, and it has sought to exercise that power by enabling consumers to hold credit repair companies liable for statutory violations.  But Congress must operate within the confines of Article III, which "requires a concrete injury even in the context of a statutory violation."  *Spokeo*, 136 S. Ct. at 1549.  Thus, Plaintiff cannot demonstrate standing simply by pointing to NCC's or Credit-RX's procedural violation.  She must show that the violation harmed or "presented an 'appreciable risk of harm' to the underlying concrete interest that Congress sought to protect."  *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017) (citation omitted); *Casillas*, 926 F.3d at 333.

The complaint does not plead any harm or appreciable risk of harm to Plaintiff as a result of this alleged statutory violation.  It does not, for example, assert that NCC *never* provided credit

report consulting and analysis services, or that the services were somehow deficient. Nor does the complaint state that Plaintiff would have canceled the CSA if NCC had waited the statutorily-required three days before charging her. As filed, the complaint makes out only a "bare procedural violation" for the $189 charge, and that is not enough to confer Article III standing on Plaintiff. See *Casillas*, 926 F.3d at 332 (citing *Spokeo*, 136 S. Ct. at 1549).

        2.     *The monthly charges*

Plaintiff also seeks reimbursement of all monthly charges that she paid to Defendants "for Defendants' misrepresentations regarding both the substance and efficacy of their services." [36] at 8. While this looks more like a request for damages rather than a description of an injury, the Court construes it as an argument that each monthly payment of $69—the complaint does not say how many there were—was an injury, because NCC and Credit-RX misrepresented their services.

This proposed injury suffers the same problem as the previous one. While the complaint does allege that Plaintiff "began paying NCC and Credit-RX a monthly fee" ([1] at 5), it does not contain further factual allegations to demonstrate that the payments harmed Plaintiff. For example, the complaint does not say that NCC and Credit RX did not actually cause inaccurate entries on Plaintiff's credit report to be removed, or that her credit score did not improve. Even accepting that NCC and Credit-RX misrepresented their services—as the Court must at this stage in the litigation—the complaint does not plead the consequences of the misrepresentations, and it does not establish an "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560. As a result, paying the monthly charges, as pled in the complaint, does not constitute a concrete injury sufficient to confer standing for Article III purposes.

        3     *The opportunity to have genuine subsequent disputes reviewed by CRAs*

The Seventh Circuit has stated that Article III's injury requirement is met when a plaintiff alleges that she was "deprived of a chance to obtain a benefit." *Robertson v. Allied Solutions*, 902 F.3d 690, 697 (7th Cir. 2018). Plaintiff seems to rely on that principle in arguing that "as a result of Defendants['] repeated disputes of trade lines as generically inaccurate on Ms. Perta's consumer reports, she is divested of the opportunity to have genuine subsequent disputes reviewed by CRAs," and this lost opportunity constitutes an injury. [36] at 8. The brief also asserts that "CRAs are known to reject disputes after the consumer has lodged a certain number of them concerning the same item" and cites a Consumer Protection Bureau website. *Id.* at 8-9. The brief continues, "Ms. Perta may find herself in a situation where if she wishes to properly dispute inaccurate information on her consumer report, she is without recourse since Defendants sent numerous generic disputes already." *Id.* at 9.

Plaintiff's assertions in the brief may or may not be right, but—crucially—they are not in the complaint. The complaint does not contain allegations about lost opportunity for future disputes, CRAs policies or practices regarding rejecting disputes, or Plaintiff's desires to dispute inaccurate credit information in the future. Because the complaint does not allege these facts, Plaintiff cannot rely on them now and cannot use the opposition brief to set them in front of the Court. "It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012) (citing *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989)). Plaintiff's "lost opportunity" theory thus cannot at this time be considered an injury for Article III standing purposes.

### 4 *Informational injuries*

10

Finally, Plaintiff argues that she suffered "informational injuries" "within the line of cases post-*Spokeo*," citing *Spokeo*, 136 S. Ct. at 1548 (but not citing any post-*Spokeo* cases). Specifically, she contends that Defendants both failed to inform Plaintiff that CRAs are not required to act upon disputes that are sent by Credit Repair Organizations and also misrepresented the substance and efficacy of their services. [36] at 9. The complaint does contain allegations to this effect (see [1] at 6-7, ¶¶37, 44, 45), and the Court will take as true both the underlying assertion (i.e. that CRAs may refuse to process disputes from a credit repair organization) and the claim that Defendants did not inform Plaintiff (i.e., that Defendants did not tell Plaintiff that CRAs may refuse to process disputes).

An informational injury occurs when the defendant refuses to provide the plaintiff with information that a law—typically, a sunshine law—entitles her to obtain and review for some substantive purpose. See*, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21, 24–25, (1998) (concluding that voters' inability to obtain information subject to disclosure under the Federal Election Campaign Act of 1971 is a sufficiently concrete injury); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449, (1989) (explaining that, to satisfy Article III's injury requirement, advocacy organizations requesting information subject to disclosure under the Federal Advisory Committee Act need only show "that they sought and were denied" the information); *Casillas*, 926 F.3d at 337–38 ("[*Akins* and *Public Citizen*] hold that the *denial of information subject to public disclosure* is one of the intangible harms that Congress has the power to make legally cognizable." (emphasis in original)). However, "[a] harm is not an informational injury simply because it has something to do with information." *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 835 (7th Cir. 2019).

11

The complaint does not allege that Plaintiff was entitled by law to obtain certain information, or review it for a substantive purpose, or that Defendants failed to provide Plaintiff with that information. To be sure, it alleges (generally) that Defendants made misrepresentations about their services, and that Defendants withheld certain information from Plaintiff, including that creditors may refuse to ignore disputes from credit repair organizations and credit bureaus may refuse to process repeated disputes. [1] at 7. And there are many laws that attempt to protect a consumer's right to transact business free from fraudulent statements and omissions. But Plaintiff has not pled that Defendant denied her access to information that was subject to disclosure and that she was entitled to review by law. *Cf. Public Citizen,* 491 U.S. at 449 (failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"); *Akins*, 524 U.S. at 25 (concluding that denial of information required to be disclosed under the Federal Election Campaign Act of 1971 2 U.S.C. § 431(4) was "sufficiently concrete and specific" to satisfy the injury-in-fact requirement of Article III).

Nor has Plaintiff cited precedent stating that CROA or CSOA or ICFA entitles citizens to obtain and review certain information for some substantive purpose, as the Federal Election Campaign Act of 1971 and the Federal Advisory Committee Act do. Furthermore, post-*Spokeo* cases in the Seventh Circuit have tended *not* to expand the category of "informational injuries." See*, e.g. Casillas*, 926 F.3d at 334 (debt collections letter that failed to specify that debtor must communicate in writing to trigger the statutory protections was a "bare procedural violation," not an informational injury, and plaintiff lacked standing); *Groshek*, 865 F.3d at 888 (employer's disclosure form that contained extraneous information in violation of the Fair Credit Reporting Act was not an informational injury and plaintiff lacked standing); *Meyers v. Nicolet Restaurant*

12

*of De Pere, LLC*, 843 F.3d 724, 727 (7th Cir. 2016) (holding that defendant's failure to truncate the expiration date from the plaintiff's credit card receipt was not an informational injury and plaintiff lacked standing); contrast with *Robertson*, 902 F.3d at 695-97 (plaintiff who was denied a job had standing to sue employer, because she alleged that the employer withheld a background report that the Fair Credit Reporting Act required the employer to disclose and thereby denied plaintiff the opportunity to assess the information in the report and to explain it or add context).

The complaint does not plead facts sufficient to establish an informational injury, and the opposition brief does not cite law allowing this Court to conclude that Defendant's purported misrepresentations or omissions fall into that category of harms. The alleged informational injury, as pled, is not sufficient to establish Article III standing.

### B.      Dismissal with Leave to Amend

Because the complaint does not establish a concrete injury, the Court concludes that it lacks subject matter jurisdiction and dismisses the complaint. *Miller v. Herman*, 600 F.3d 726, 730 (7th Cir. 2010) ("[W]hen a federal court concludes it lacks subject matter jurisdiction, the court must dismiss the complaint in its entirety.") (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, (2006)). The Court declines to address Defendants' other arguments for dismissal at this time. However, just because Plaintiff has not yet pled a concrete injury does not mean she cannot, and in fact Plaintiff's opposition brief seeks, in the alternative to denying the motion to dismiss, leave to amend the complaint. [36] at 15. That request is granted.

## IV.    Conclusion

For the reasons explained above, the motion to dismiss [25] is granted and the complaint [1] is dismissed for lack of subject matter jurisdiction, because it fails to allege a concrete injury as required for Article III standing. The dismissal is without prejudice and with leave to file an

13

amended complaint by October 28, 2019.  This case is set for further status hearing on November 5, 2019 at 9:00 a.m.

Dated: September 30, 2019

_____
Robert M. Dow, Jr.
United States District Judge